Docket Nos. 105849, 105952 cons.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

---

*In re* A.W., Jr., *et al.*, Minors (The People of the State of Illinois, Appellant, v. P.W., Appellee)–*In re* A.W., Jr., *et al*., Minors (The People of the State of Illinois, Appellant, v. A.W., Sr., Appellee).

*Opinion filed October 17, 2008.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

On March 28, 2006, the State filed separate petitions, which were consolidated for hearing, asking that A.W., Jr., and A.W. be adjudicated neglected minors. The parents of the children are A.W., Sr. (father), and P.W. (mother). The petitions alleged that the minors' environment was injurious to their welfare, and paragraph A of the petitions listed eight incidents of erratic and/or violent conduct on the part of father as the basis for this allegation. The circuit court of Peoria County adjudicated the children neglected minors and later entered a dispositional order declaring them wards of the court and awarding guardianship to the Department of Children and Family Services (DCFS) with right to place. The dispositional order found

mother "fit" and father "unfit" but stated that the children could not be returned to mother because she was still residing with father.

Father and mother filed separate appeals. The appellate court in mother's appeal held that the trial court's finding of neglect was against the manifest weight of the evidence and it, therefore, reversed the adjudicatory order and vacated the dispositional order. No. 3–06–0830 (2007) (unpublished order under Supreme Court Rule 23). The appellate court in father's appeal took judicial notice of its decision in mother's appeal and reversed the judgment of the circuit court. No. 3–06–0859 (2007) (unpublished summary order under Supreme Court Rule 23(c)). We granted the State's petition for leave to appeal in both cases and consolidated them for our review. 210 Ill. 2d R. 315. For the reasons that follow, the judgments of the appellate court are reversed and the judgment of the circuit court is affirmed.

BACKGROUND

The circuit court conducted the adjudicatory hearing on September 8 and 29 of 2006. A.W., Jr., was 13 years old and A.W. was 8 years old at the time. All of the incidents in the record took place in the City of Peoria. The State presented 10 witnesses, including 5 city police officers. Father and mother were each asked in open court by their respective counsel if they wished to testify, and each declined.

Police officer Fred Ball, who was retired at the time of the hearing, testified that he was called to the home of father and mother on May 30, 1995. When he arrived he spoke to mother, who had a minor laceration on her hand and several contusions on her face, legs and arms. She said that father had gone to her place of employment and told her that she was needed at home because her brother had been injured. After they got home, father took her into the back bedroom and began beating her and accusing her of being with another man. Mother told the officer that father had broken a large picture containing glass over her head, hit her with his fist, and struck her hand with a knife, causing the laceration. A.W., Jr., who was 15 months old at the time, was on the bed. The officer found broken glass all over the bed, but father and the baby were not there when he

-2-

arrived. Mother said father took the baby and left. She ran to a neighbor's house and called the police.

The State introduced a copy of the medical report from the hospital that treated mother on the night father assaulted her. Mother told the hospital staff that father had struck her in the head and face with his fist, kicked her multiple times, hit her in the head with a glass picture frame which broke, struck her in the head once with a brass table leg, and threatened to kill her with a knife, although he did not stab her.

Jittaun Woods, father's half-sister, testified that over the past year and a half prior to May 9, 2005, father started displaying a lot of anger and seemed confused at times. She said that he was having financial difficulties, that the family would help each other out financially whenever necessary, and that she and some family members had helped father financially. She testified that his recent behavior was uncharacteristic and that previously he had been a loving and supportive brother.

On May 9, 2005, father was acting irrationally and was swearing at his brother over the telephone. When Jittuan learned of this, she called ERS to go to father's house to ensure that everyone in father's house was safe. (The record does not contain any information about ERS.) Later that evening she and her husband went to father's house because of her concern about his behavior. Father was on the porch and his children A.W., Jr., and A.W. were standing in the doorway. Father said to Jittaun that he was very angry that she had called ERS earlier that day and he punched her in the forehead. Jittaun was dazed, and she went to the emergency room, after the police were called. Father admitted to the responding police officer, Earl Jackson, that he had punched Jittaun. Officer Jackson testified he could not recall seeing any children around. Father was arrested and spent several days in jail. When he was released from jail, he apologized to Jittaun and said he was under a lot of stress.

Father's brother Jeremy testified that he received two telephone calls and a voice mail from father on May 10, 2005, while Jeremy was in a meeting at work. In the voice message father said that Jeremy needed to act more like his brother, that he did not appreciate the way Jeremy was treating him, and that he was going to beat him up if Jeremy did not lend him the money he had promised. Jeremy

testified that he felt he was in danger and that as siblings they fought but in their adult life he had never threatened him in any way.

Police officer Chad McCollum testified that on January 11, 2006, he pulled over a vehicle driven by father because he was not wearing his seat belt. While the officer was placing his police vehicle in park, father left his vehicle and began walking toward the officer in an aggressive manner with his hands outstretched. Father said, "I knew you were going to stop me. Just take me to jail." The officer told father to get back into his car, but father continued forward. The officer repeated the instruction two more times before he arrested and handcuffed father for obstructing police. Father was loud and argumentative, and he stated he was wearing his seat belt. The officer asked him his name and father said he knew his rights and he did not have to talk to him. Father then told the officer that he "was a crooked cop" who "was being played by the system." Father continued to be upset until he was placed in the transport wagon.

David Obergfeld, the principal of Von Steuben Middle School, testified that A.W., Jr., attended the school between December 12, 2005, and March 8, 2006. On February 13, 2006, the acting assistant principal was going to A.W., Jr.'s home room and observed A.W., Jr., standing by the pencil sharpener with a pencil at his penis making gyrations behind the teacher who had her back to him. The acting assistant principal took A.W., Jr., to the office. A.W., Jr., admitted what he had done and said he was trying to impress some other boys in the classroom. The principal gave A.W., Jr., a three-day suspension for showing disrespect to a teacher.

The principal then called the family on the telephone and talked to mother. He described A.W., Jr.'s disrespect to a teacher in detail and told her that A.W., Jr., was suspended for three days. The principal testified that mother was very calm and very nice, that she appreciated the telephone call, and that someone would come over and pick up A.W., Jr. Later that day father came to the school with a police officer. The principal was surprised by the presence of the police officer, who told the principal that father was afraid to come to the school and thought there were going to be some problems.

The principal, the acting assistant principal, father, A.W., Jr., and the police officer all went into the assistant principal's office. The principal told father of A.W., Jr.'s disrespect to a teacher by holding

a pencil near his penis and making gyrating motions while the teacher was standing with her back to him and that A.W., Jr., was suspended for three days, and handed father the suspension form. Father asked A.W., Jr., if the story was correct and A.W., Jr., said that he was just doing some kind of dancing. Father crumpled up the form, threw it across the room, and said, "This is bullshit." The principal then said, "We don't talk that way. This meeting is over. It's disrespectful behavior. I'm asking you to leave." Father continued to argue and the principal asked the police officer, "Would you please escort him out?" Father argued with the police officer and asked for the officer's badge number before finally leaving. This incident resulted in father receiving a letter from the school's attorney barring father from the school grounds unless he had the principal's permission.

John Gingery, the paternal grandfather of the children, testified that on March 11, 2006, A.W., Jr., and A.W. arrived at his house. A.W., Jr., told grandfather that father received a telephone call, came outside, and told the children to leave. Grandfather's house is about three miles from the parents' house. A.W., Jr., said that they had been walking around for three hours with only one coat, which they would switch off wearing. Grandfather then telephoned Jittaun Woods. They agreed to meet at father's house to find out what was going on with the children. The children stayed at grandfather's house with grandfather's wife.

When grandfather arrived at father's house, Woods was there with her husband, and father and mother were in their car. Grandfather and father had not had any contact with each other for over a year. During that year, father had threatened to kill grandfather and had said to grandfather that he was the reason that father's head was so "f___ed up." Father said on this occasion "I see the bitches run together" and approached grandfather in a fighting stance with his fists balled up. Grandfather grabbed father, but Woods and her husband intervened.

Officer Aaron Watkins testified that on March 11, 2006, he responded to a call from father's house. When the officer arrived, father initially expressed frustration with the amount of time it had taken the police to arrive. Grandfather was at the parents' house when the officer arrived and the children were still at grandfather's house. Father told the officer his children had left the house and they had been gone for quite some time. He said the children had gotten into

trouble at a friend's house, and father let them know they were going to be reprimanded when they got home. Father was carrying in groceries when he told them to get into the house to receive their punishment, and they ran off. The officer testified that he went to grandfather's house, got the children and then brought them to their parents' home.

The officer further testified that A.W., Jr., wanted to go live with his grandfather and father had no problem with that. The officer then checked with grandfather, who was still outside of the house, and grandfather agreed. They also agreed to talk with a case worker the next day or somebody else to help them out with the situation. A.W., Jr., then went with grandfather and A.W. stayed with her parents.

Two days later, on March 13, 2006, Raelyn Galassi, a child protection investigator for DCFS, testified that she went to grandfather's home and spoke to A.W., Jr. When she asked if he wanted to go home, he said that he did not want to go home because there was a lot of chaos there and his father was mad and yelled all the time. He also said that his mother and father fought and his mother would leave home sometimes. A.W., Jr., stated that things had not always been that way, but only for the last year or a little over. When asked, he said that he was not attending school anymore and that he was not being home schooled.

Later that same day, Galassi spoke to father and mother at their home. When she asked why A.W., Jr., was not in school, father stated that A.W., Jr., was being picked on in school. He said that he went to the school and was trying to deal with school personnel on what the problem was and he was told that he was banned from the school. He also said that they were working on getting him back to school. Mother said that there had been disciplinary problems in schools with A.W., Jr., since kindergarten, that they were currently home schooling him, and that they were willing to try to get him back into school. Both father and mother agreed at this time to participate in services offered by DCFS to get A.W., Jr., back into school.

The next day, on March 14, Galassi left father and mother a message that A.W., Jr., would be coming back home that day. That same day, police officer David Slater was sent to grandfather's house at about 2:30 in the afternoon after father had called the police. Slater testified that father was in a vehicle waiting nearby when he arrived.

Father told the officer that his son was in the house and he wanted the officer to get his son out. The officer had never met father and the officer knew nothing of the situation. When father telephoned the police, he asked for help to get his son and hung up. The officer asked for information concerning the problem and father replied, "I don't have to tell you anything. Just go get my f___ing son out of the house." He repeated this statement several times. Father was irate and the officer tried to calm him down several times, but he remained loud and agitated. After father said, "f___ you and the other police" to the officer, he threw his cell phone toward grandfather's garage. The phone hit the concrete driveway and shattered. The officer then knocked on the door of the house, talked to grandfather, and learned that A.W., Jr., was not there. Father had been standing on the sidewalk and he then left.

Three days later, on March 17, 2006, Galassi went to the family home and she saw father and A.W., Jr., outside. She asked how things were going. Father was angry and he stated that he did not want DCFS in his business and that he wanted her off his property. She tried to tell him that she was just following up with what they talked about on March 14. He told her to get off his property and go get some counseling herself.

Five days later, on March 22, there was a family meeting at DCFS at father's request. Galassi was present along with her supervisor and a "TDM facilitator," mother, father and his half-sisters, Jittuan and Mia, and grandfather. (The record does not contain any information about TDM.) The parents had the right to have the facilitator exclude grandfather and father's half-sisters, but they were not excluded. Galassi and her supervisor started the meeting with the concerns they had with the family. Father got very upset and volatile and started arguing and yelling, mostly at grandfather. Grandfather became upset as well, and Galassi and her supervisor tried to break up the meeting. The police were called and father and mother left.

On April 3, 2006, Galassi and her supervisor went to the family home. Galassi knocked on the door and it appeared someone was inside locking the door. The supervisor put a card in the door and the two left. The next day, Galassi referred the family to Family First. Galassi also went to the family home on a daily basis during the middle of April, but she could not contact the family.

Galassi testified that DCFS decided that neglect petitions should be filed as a means of getting the court to order the parents to cooperate with DCFS. When the parents failed to appear for the initial hearing, warrants were issued for the children to be placed in protective custody. On April 27, 2006, Galassi picked up the children and took them into protective custody. A.W., Jr., told Galassi that he had seen her coming to their residence on other occasions, but he had been instructed not to answer the door.

At the conclusion of the adjudicatory hearing on September 29, 2006, the circuit court stated that it would announce its decision the next week, but that it was making certain factual findings now. The court went through each allegation and found that the State had proved all eight of the allegations contained in paragraph A of the petitions. The court also found that the State had proved the allegation made in paragraph B of the petitions, that DCFS had offered father services, including counseling, but father had refused to cooperate or begin services. The court did explain at some length that the parents did not have any obligation to cooperate with DCFS at that time.

In its concluding statements, the court said: "The question is, taking into account everything that I find having been proven by preponderance of the evidence, does that show the existence of an injurious environment? And, obviously, under the principle of injurious environment, you're not required to wait for the injury to occur before the court steps in and says, wait a minute, we've got to protect these children."

On October 6, 2006, the court announced its finding and entered an adjudicatory order finding that the children were neglected based upon an injurious environment. The finding was based on the series of incidents contained in the record showing that father had engaged in unusual displays of aggression and hostile, irrational behavior, some of which were in the children's presence.

The dispositional hearing was held on November 8, 2006. Catholic Charities caseworker Tonya Welch, who was assigned to this family pursuant to contract with DCFS, testified at the hearing and the court considered her report on each child. The caseworker testified that father and mother refused to cooperate with her and accept the services offered. Father and mother both refused

supervised visitation with the children. The circuit court enter a dispositional order finding mother "fit" and father "unfit" but stated that the children could not be returned to mother because she was still residing with father. The order declared the children wards of the court and awarded guardianship to DCFS with right to place.

The appellate court in mother's appeal described four incidents where the children were not present during father's outbursts. The court found that those four incidents did not show any nexus between father's anger and harm to the well-being of the children, and it held the circuit court erred in considering those incidents.

The appellate court held that the trial court's finding of neglect was against the manifest weight of the evidence and it, therefore, reversed the adjudicatory order and vacated the dispositional order. One justice dissented and stated he would affirm the circuit court. The appellate court, in father's appeal, took judicial notice of its decision in mother's appeal and reversed the judgment of the circuit court. We granted the State's petition for leave to appeal in both cases and consolidated them for our review. Mother filed a brief and presented oral argument in the consolidated appeal, but father did not file a brief and, consequently, he did not present oral argument.

## STANDARD OF REVIEW

The parties agree that the issues raised in this appeal are: (1) whether the circuit court erred in allowing and considering evidence of erratic, threatening and angry behavior by father that took place outside the presence of the children; and (2) whether the circuit court's decision that the children were neglected based upon an injurious environment is against the manifest weight of the evidence. The parties correctly agree that the standard of review for the first issue is whether the trial court abused its discretion in admitting and considering evidence of father's behavior that occurred outside the presence of the children. See *In re Kenneth D.*, 364 Ill. App. 3d 797, 803 (2006). The admission of evidence by the circuit court will not be reversed absent an abuse of its discretion. See *In re Kenneth J.*, 352 Ill. App. 3d 967, 980 (2004). Finally, the parties correctly agree that the manifest weight of the evidence is the standard to be used in reviewing the circuit court's determination that the children were

neglected based upon an injurious environment. *In re D.S.*, 217 Ill. 2d 306, 322 (2005). A finding is against the manifest weight of the evidence only if the opposite result is clearly evident. *In re D.S.*, 217 Ill. 2d at 322; *In re Faith B.*, 216 Ill. 2d 1, 13-14 (2005).

## ANALYSIS

The Juvenile Court Act of 1987 (Act) sets forth the procedures and criteria to be used in deciding whether a minor should be removed from his parents' custody and made a ward of the court. 705 ILCS 405/1–1 *et seq*. (West 2004); *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). Section 2–3(1)(b) of the Act provides that a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2–3(1)(b) (West 2004). The term "injurious environment" is a broad and amorphous concept that cannot be defined specifically, but it includes the breach of a parent's duty to ensure a safe and nurturing shelter for the children. *In re Arthur H.*, 212 Ill. 2d at 463. Cases involving allegations of neglect are *sui generis*, and they must be decided on the basis of their unique circumstances. *In re N.B.*, 191 Ill. 2d 338, 346 (2000). This principle underscores the " 'fact-driven nature of neglect and injurious environment rulings.' " *In re Arthur H.*, 212 Ill. 2d at 463, quoting *In re N.B.*, 191 Ill. 2d at 346.

The appellate court, in mother's appeal, stated, "In cases where parental anger has been the basis for a finding of an injurious environment, the State is required to prove a nexus between the parental anger and harm to the well-being of the minors." In support of this statement the court cited *In re N.B.*, 191 Ill. 2d 338, and *In re J.P.*, 331 Ill. App. 3d 220 (2002). After describing four of the incidents of father's behavior where the children were not present, the court concluded, "[t]aken individually and in relation to the rest of the State's evidence, these incidents do not show any nexus between the father's anger and harm to the well-being of the minors." The court held that the circuit court erred in considering those four incidents of father's behavior that occurred outside the presence of the children. The appellate court cited no authority for this holding and we have found none.

To the contrary is the case of *In re J.P.*, 331 Ill. App. 3d 220 (2002). There the appellate court affirmed the circuit court's determination that the children, J.P. and T.P., were neglected based upon an injurious environment. *In re J.P.*, 331 Ill. App. 3d at 222. The court stated: "[T]he evidence of respondents' loss of temper was not confined to a single, isolated instance. Rather, the evidence indicated a pattern of behavior by respondents, consisting of extreme displays of aggression and hostility, *some of these displays occurring in the presence of their children.*" (Emphasis added.) *In re J.P.*, 331 Ill. App. 3d at 236.

The State contends that there are many parental actions outside of the presence of the children that create an injurious environment, examples of which are drug use, alcohol use and untreated mental-health problems. See, *e.g.*, *In re A.R.*, 359 Ill. App. 3d 1071 (2005); *In re J.W.*, 289 Ill. App. 3d 613 (1997). It argues that the appellate court's decision in this case could require circuit courts to disregard highly probative evidence relating to a parent's behavior on the basis that the children were not present when the incidents took place. This would be contrary to the legislative intent of the Act, which is to further the safety and best interests of children. 705 ILCS 405/1–2 (West 2004); *In re Arthur H.*, 212 Ill. 2d at 467. Mother acknowledges that drug use, alcohol use and untreated mental-health issues regularly form the basis for a finding of anticipatory neglect or a *de facto* injurious environment, but she contends that there is no doubt they will continue to form the basis of neglect findings should the appellate court opinion be affirmed.

"Under the Act, the rules of evidence in the nature of civil proceedings are applicable to the adjudicatory hearing. 705 ILCS 405/2–18(1) (West 2004). Whether evidence is admissible is within the discretion of the circuit court, and its ruling will not be reversed absent an abuse of that discretion. *In re Kenneth J.*, 352 Ill. App. 3d 967, 980, 817 N.E.2d 940, 950 (2004). All evidence must be relevant to be admissible. *Kenneth J.*, 352 Ill. App. 3d at 980, 817 N.E.2d at 950. Evidence is relevant if it tends to prove a fact in controversy or render a matter in issue more or less probable. *Kenneth J.*, 352 Ill. App. 3d at 980, 817 N.E.2d at 950." *In re Kenneth D.*, 364 Ill. App. 3d 797, 803 (2006). We hold that in cases in which parental anger is the basis for a finding of an injurious environment, evidence of

parental anger and hostility in the presence, as well as outside the presence, of the children is admissible if it is relevant, and the determination of its relevancy is within the sound discretion of the circuit court. See *In re J.P.*, 331 Ill. App. 3d 220.

We next consider whether the trial court abused its discretion in admitting evidence of father's behavior outside the presence of the children as establishing a pattern of hostility and anger on the part of father that was injurious to the children's welfare. Father's pattern of erratic behavior included a total of eight incidents, four of which were outside the presence of the children. Two of the eight incidents involved physical violence, others involved threats of violence, and several involved erratic, aggressive and angry behavior. Recipients of these outbursts included father's wife, brother, half-sister and father, the school principal, DCFS workers and several police officers.

Under the facts and circumstances of this case, we hold that the circuit court did not abuse its discretion in admitting and considering the incidents of father's angry behavior that occurred outside the presence of the children. See *In re J.P.*, 331 Ill. App. 3d at 236.

The appellate court also found that the circuit court may have erroneously considered evidence against father that DCFS offered services to father, which he refused, as alleged in paragraph B of the petition. Although the circuit court found father had refused such services, it explained that father was under no obligation to participate with DCFS at that time. We have read the record carefully and do not find that the circuit court improperly considered that evidence against father.

The appellate court also held that the State failed to prove the allegation of the petitions with regard to the March 11, 2006, incident, and the circuit court should not have weighed that allegation in its decision. The allegation, in part, was that the children "were not allowed back into the family home by the father and/or ran from home due to the problems with the father." Grandfather testified that A.W., Jr., told him that the children were outside and father told them to leave. Officer Watkins testified that father told him that the children were outside, father told them to get into the house to receive their punishment, and they ran off. The circuit court in discussing this allegation stated: "The State has proved that one of those two things happened. *** I don't really think that either one of those was shown

by a preponderance of the evidence, but that's the only evidence I have. So that wasn't either/or. The preponderance of the evidence showed that one of those two things happened, either the father excluded them from the home or they ran for fear of punishment." We find that whether the children "were told to leave" or whether they "ran off when they were told to go into house," the circuit court properly considered the testimony of grandfather and Officer Watkins as to the events of March 11, 2006.

We turn next to the issue of whether the decision of the circuit court was against the manifest weight of the evidence. After the appellate court found the circuit court erroneously considered testimony of any of father's erratic, threatening and angry behavior that occurred outside the presence of the children, the appellate court stated that it had only three incidents that occurred in front of one or both of the children to consider. The first was the incident on February 13, 2006, when father became angry and swore in front of A.W., Jr., after father learned A.W., Jr., was going to be suspended from school. The appellate court, while not condoning father's actions, stated it failed to see how A.W., Jr.'s well-being was threatened by father's outburst. The second incident was on May 30,1995, when father beat mother in front of A.W., Jr., who was then 15 months old. The appellate court acknowledged that this conduct was serious, but it found that the circuit court correctly noted that this incident was so remote in time that it should carry very little weight. The third incident occurred on May 9, 2005, when father punched his half-sister in the forehead in the presence of the children. While the appellate court found the act egregious, it failed to see how this isolated incident was indicative of a threat to the well-being of the children.

The appellate court, in conclusion, stated: "Accordingly, we hold that the State failed to establish the requisite nexus between the father's anger and harm to the minors' well-being, and that the circuit court's neglect finding was against the manifest weight of the evidence." The appellate court relied primarily on *N.B.*

*N.B* involved two minor children, N.B. and C.R., who were found neglected under the Act because they were subjected to an environment injurious to their welfare, and at a later hearing they were made wards of the court. *In re N.B.*, 191 Ill. 2d at 340. The

finding of neglect was based on two incidents of uncontrolled temper by the mother that occurred at a county health department facility. The appellate court affirmed the circuit court and we reversed the appellate court. *In re N.B.*, 191 Ill. 2d at 340.

The first incident occurred on April 7, 1997, when the mother became enraged when she was informed that the coupons she wished to redeem for milk for her children could only be redeemed for powdered milk and were not redeemable for liquid milk. *In re N.B.*, 191 Ill. 2d at 341. During the angry outburst she screamed at an employee, threw the milk coupons, a jacket and a diaper bag onto a chair and then extended her arms when she picked up her baby carrier, causing it to hit a wall. *In re N.B.*, 191 Ill. 2d at 341. N.B. and C.R. were present during their mother's angry outburst. *In re N.B.*, 191 Ill. 2d at 347.

The second incident occurred about a week later on April 15, 1997, when mother went to the same health facility. *In re N.B.*, 191 Ill. 2d at 348. She was to undergo an examination by a doctor, but she refused to enter the examination room until a camera in the room was covered. Mother alternated between anger and crying during this encounter, which lasted about 15 minutes. N.B. was present with her mother during this second incident. *In re N.B.*, 191 Ill. 2d at 348.

Katherine Dello, an employee of Metropolitan Family Services as a clinical social worker, saw the mother at least once a week for approximately six months, beginning in December 1995. *In re N.B.*, 191 Ill. 2d at 349. Dello saw C.R. with his mother at least every other week. (This was prior to N.B.'s birth.) She testified that the child always appeared to be well taken care of and properly clothed. She observed the mother get frustrated with C.R., but the frustration was consistent with any parent's reactions to a three-year-old. Dello never saw her strike or abuse the boy in any way. *In re N.B.*, 191 Ill. 2d at 349.

After analyzing the evidence, this court concluded: "In sum, the circuit court's ruling turned on two incidents in which respondent displayed anger at persons not her children, and in which there was no proof of actual harm to her children. When coupled with Dello's testimony, which indicated acceptable parenting by respondent, we find no evidence to suggest that respondent breached her duty to provide a 'safe and nurturing shelter.' " *In re N.B.*, 191 Ill. 2d at 351,

-14-

quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995). We then held, on the record before us, that the finding of neglect was against the manifest weight of the evidence. *In re N.B.*, 191 Ill. 2d at 353-54.

The State argues that the situation in the case before us is more like that in *J.P.* than in *N.B.* In *J.P.* the father contended that the evidence of the parents' statements to caseworkers and hospital personnel did not support a finding of neglect based on an injurious environment. *In re J.P.*, 331 Ill. App. 3d at 235. Two caseworkers testified regarding the parents' hostile behavior toward DCFS, including death threats by the father against the two workers. *In re J.P.*, 331 Ill. App. 3d at 236. Hospital records showed father threatened hospital staff, attempted to remove T.P. from the hospital against medical advice, and refused to allow T.P. to be transferred to a different hospital for treatment. *In re J.P.*, 331 Ill. App. 3d at 236. The appellate court found that the trial court's finding of neglect was not against the manifest weight of the evidence. *In re J.P.*, 331 Ill. App. 3d at 236.

Here, as we have noted earlier, there was testimony of eight separate angry outbursts by father, two involving physical violence, others involving threats of violence, and several involving erratic, aggressive and angry behavior. Recipients of these outbursts included father's wife, brother, half-sister and father, the school principal, DCFS workers and several police officers. In many of the incidents, the city police became involved in calming the situations. There was also evidence of father's behavior in the home. Raelyn Galassi, the child protection investigator for DCFS, testified that she went to grandfather's home and spoke to A.W., Jr., on March 13, 2006. When she asked if he wanted to go home, he said that he did not want to go home because there was a lot of chaos there and his father was mad and yelled all the time. He also said that his mother and father fought and his mother would leave home sometimes. A.W., Jr., stated that things had not always been that way, but only for the last year or a little over.

The appellate court, on the other hand, only considered the three incidents it found had occurred in the presence of the children in finding that the judgment of the circuit court was against the manifest weight of the evidence. As we noted earlier, the admission of

evidence by the circuit court concerning eight incidents was not an abuse of discretion.

An adjudication of neglect is to be reviewed based on the totality of the evidence. See *In re J.P.*, 331 Ill. App. 3d at 230. Considering the totality of the evidence, we find that the order of the circuit court adjudicating the neglect of A.W., Jr., and A.W. based on an injurious environment is not against the manifest weight of the evidence.

For the foregoing reasons, the judgments of the appellate court in No. 105849 and No. 105952 are reversed and the judgment of the circuit court is affirmed.

*Appellate court judgments reversed;*
*circuit court judgment affirmed.*