NOTICE

Decision filed 09/28/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 210084-U

NO. 5-21-0084

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* J.C., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Saline County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20-JA-50 |
| | ) | |
| Kimberly B., | ) | Honorable |
| | ) | Todd D. Lambert, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1   *Held*:   We affirm the trial court's adjudicatory order, as the court's finding that the minor was neglected due to an injurious environment was not against the manifest weight of the evidence. We also affirm the court's dispositional order, as the court's findings that it was in the minor's best interest to be made a ward of the court and that the respondent-mother was unable, for some reason other than financial circumstances alone, to care for the minor were not against the manifest weight of the evidence, and the court did not abuse its discretion in placing the minor in the custody and guardianship of the guardianship administrator of the Illinois Department of Children and Family Services.

¶ 2   The respondent, Kimberly B., appeals the adjudicatory order of the circuit court of Saline County finding that her minor child, J.C., was neglected due an injurious environment. Kimberly B. also appeals the court's dispositional order in which the court, after finding that it was in J.C.'s best interest to be made a ward of the court and that Kimberly B. was unable, for some

1

reason other than financial circumstances alone, to care for, protect, train, or discipline J.C., placed J.C. in the custody and guardianship of the Guardianship Administrator of the Illinois Department of Children and Family Services (DCFS). For the following reasons, we affirm.[1]

¶ 3                                  I. Background

¶ 4     On October 19, 2020, the State filed a two-count petition for adjudication of wardship pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2020)), alleging that J.C. (born November 18, 2003) was neglected due to an environment that was injurious to her welfare (*id.* § 2-3). Count I specifically alleged that J.C. was observed to have several bruises in various stages of healing on October 14, 2020. Count II specifically alleged that J.C. was fearful of returning home due to ongoing domestic violence between Kimberly B. and Jason B., J.C.'s stepfather. Kimberly B. and J.C.'s biological father, Richard C.,[2] both received a summons to appear at the temporary custody hearing and to answer the petition.

¶ 5     At the temporary custody hearing held on October 19, 2020, an attorney was appointed to represent Kimberly B., and a guardian *ad litem* (GAL) was appointed for J.C. Following the hearing, the trial court entered a temporary custody order placing J.C. in the custody of DCFS. The court directed DCFS to prepare and file a 45-day case plan pursuant to section 2-10.1 of the Act (*id.* § 2-10.1) and to conduct a social investigation by November 30, 2020.

¶ 6     Following the temporary custody hearing, J.C. was initially placed by DCFS in her adult sister's home but was returned to Kimberly B.'s care on November 5, 2020, after her adult sister

---

[1]This is an accelerated appeal under Illinois Supreme Court Rule 311(a) (eff. July 1, 2018). With respect to such cases, Rule 311(a)(5) provides, in relevant part, that "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, the 150-day period to issue a decision expired on August 23, 2021. However, Kimberly B. was granted two extensions of time to file her appellant's brief. As a result, briefing in this appeal was not completed until July 30, 2021. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

[2]Richard C. is not a party to the appeal.

was arrested. On November 24, 2020, J.C. was removed, once again, from Kimberly B.'s care when Kimberly B. reported to DCFS that she could not handle J.C.'s disruptive behaviors.

¶ 7 On January 11, 2021, the GAL filed a report summarizing the steps taken by DCFS to ensure that J.C. received an appropriate placement, which detailed, *inter alia*, the following:

"On [February 27, 2020], [DCFS] convened a Priority Clinical Staffing on behalf of [J.C.] to determine the appropriate level of care. Documentation from the clinical staffing indicates that the team determined that [J.C.] would benefit from residential treatment. [J.C.] uses aggression to control her environment and family members. [J.C.] has hit her mother, stepfather and sister; fights in school and has assaulted school personnel. [J.C.'s] family is afraid of her due to her physical aggression. It was reported that [J.C.] runs away to get her way. Further documentation from the clinical staffing indicates that [J.C.] has seizures, a shunt and Traumatic Brain Injury (TBI). [J.C.] has a catheter and independently takes care of it. [J.C.] also has Spina Bifida. [J.C.] has an IQ of 60."

The report further detailed that the available residential treatment providers, as selected by DCFS, "can meet the emotional, behavioral, social and educational needs of [J.C.]."

¶ 8 A. Adjudicatory Hearing

¶ 9 On January 26, 2021, the trial court held an adjudicatory hearing. DCFS investigator, Jessica Horaz, and DCFS caseworker, LaDonna Chandler, testified on behalf of the State. J.C. testified on behalf of Kimberly B., who also testified on her own behalf. The following factual recitation is garnered from the testimonies provided during the adjudicatory hearing.

¶ 10 1. Jessica Horaz

¶ 11 Horaz previously worked as a child protection investigator with DCFS. On October 13, 2020, staff members at J.C.'s school called the child abuse hotline and reported that J.C. had

3

bruises on her arm which were caused by Kimberly B. Responding to the hotline report, Horaz interviewed J.C. in the school nurse's office the next day. The school nurse and social worker were also present during the interview. Horaz observed multiple bruises on J.C.'s right side—on her upper arm, thigh, hip, and back—which Horaz believed were in different stages of healing. J.C., who was initially reluctant to speak to Horaz, eventually recounted that Kimberly B. had pushed her in the garage. J.C. further informed Horaz that all of the bruises were caused by Kimberly B. J.C. recalled that the bruise on her upper arm happened when Kimberly B. grabbed her arm, and that the bruise to her back occurred when Kimberly B. pushed her over a drum set, which caused her to fall. During the interview, Horaz found it difficult to establish a timeline because J.C. was unclear as to when the incidents occurred. Horaz explained that J.C. "might say yesterday, but it could have been two days ago."

¶ 12    Horaz and J.C. then discussed the domestic violence occurring in the home between Kimberly B. and Jason B.  J.C. stated that she was fearful of returning home because there was a lot of fighting between Kimberly B. and Jason B. "and it was getting physical and worse lately." J.C. feared for Kimberly B.'s safety and would sometimes attempt to intervene, resulting in bruises on her body. Recently, after Jason B. pushed Kimberly B., J.C. ran to the neighbor's house and called 911. Horaz later verified, through the Saline County Sheriff's Department, that the incident occurred on October 12, 2020. Horaz also learned that the sheriff's department and city police department had responded to approximately 30 calls to the home, as a result of fighting between Kimberly B. and Jason B., as well as J.C.'s disruptive or violent behavior.

¶ 13    After interviewing J.C., Horaz interviewed Kimberly B. and Jason B. Horaz, then transported J.C. to Harrisburg Hospital, where the medical examination revealed additional bruises on J.C.'s back and left breast. The treating physicians could not determine when the

4

bruises were sustained but concluded that J.C. did not require medical treatment. Due to J.C.'s various medical conditions, Horaz found J.C.'s bruises especially alarming since she had an increased risk of injury from a fall.

¶ 14                                        2. LaDonna Chandler

¶ 15    Chandler, a DCFS caseworker assigned to J.C.'s case, received a phone call from Kimberly B. on October 21, 2020. During the phone call, Kimberly B. stated that Jason B. had been arrested "for laying [his] hands on her" the day before and that she was moving out of the house. During a follow-up conversation later that same day, Kimberly B. informed Chandler that Jason B. had been physically abusive to her throughout their relationship, and that she believed J.C.'s disruptive and violent behaviors stemmed from Jason B. screaming and yelling at Kimberly B. Chandler did not interview Jason B. because he was no longer residing with Kimberly B. Chandler believed that it was in J.C.'s best interest to be placed in a residential treatment facility, rather than return to Kimberly B.'s care, where J.C. could "get her needs met."

¶ 16                                        3. Kimberly B.

¶ 17    Kimberly B. believed that J.C. may have sustained the bruise to her upper arm when Kimberly B. was restraining J.C. after she punched Kimberly B. in the face. During this specific incident, which occurred several days before school staff reported the bruise to DCFS, Kimberly B. held J.C.'s arms down and sat on top of her to keep her from hurting herself or Kimberly B. until police arrived. Kimberly B. also believed that J.C. bruised her right thigh, hip, and back when she fell in the garage while helping Kimberly B. move a drum set onto a wooden platform. After the fall, J.C. became embarrassed and "got mad and stormed into the house." Kimberly B. denied causing any of J.C.'s bruises, other than possibly the bruise to her upper arm.

5

¶ 18    Kimberly B. recounted the incident where J.C. called 911 from a neighbor's house. According to Kimberly B., J.C. called 911 when she overheard an argument between Kimberly B. and Jason B. Shortly thereafter, the police arrived and spoke with Kimberly B. and Jason B. but no further action was taken. Kimberly B. also recounted the incident where she had Jason B. arrested for pushing her. After learning at the temporary custody hearing that J.C. could not return home, Kimberly B. "lost it." The next day, she informed Jason B. that she was giving up on everything and leaving. Kimberly B. explained that Jason B. tried to stop her from going out the door and "kind of pushed her," so she had him arrested for domestic violence. Kimberly B. admitted that she and Jason B. argued but claimed the arguments never turned physical. According to Kimberly B., J.C. was clumsy due to her medical conditions and sustained frequent falls.

¶ 19    Lastly, Kimberly B. recounted a recent phone conversation with J.C., where J.C. recanted her statement that Kimberly B. pushed her over a drum set. Kimberly B. expressed that J.C. began to cry and told Kimberly B. that she was sorry for "what she told the DCFS lady." J.C. then stated that she wanted to come home. Kimberly B. requested that the supervisor, who was monitoring the call, document what J.C. had said.

¶ 20                                    4. J.C.

¶ 21    J.C. was unable to recall the events at school that resulted in members of the staff calling DCFS on October 13, 2020, but she acknowledged telling DCFS that Kimberly B. had pushed her over a drum set. J.C. stated, "I mean, I did tell them that, but I didn't mean to tell them that and I told them I was sorry." When asked whether Kimberly B. actually pushed her over the drum set, J.C. stated, "I mean, I didn't see her do that. But I don't think she did that. Like I—

usually when they fight I'm trying to keep my mom safe to where she don't get hurt. And that's what I want to do is keep my mom safe to where she can't get hurt."

¶ 22   J.C. denied that Kimberly B. had ever hit or put any bruises on her. J.C. wanted to return home and was not afraid to live with Kimberly B. However, J.C. acknowledged previously stating that she was afraid to go home because Kimberly B. and Jason B. might fight again. J.C. explained, again, that "[w]henever they're fighting I'm just trying to keep my mom safe to where she can't get hurt. I mean, I don't—I don't want her to get hurt and she doesn't want me to get hurt." J.C. further explained that the arguments were loud and involved a lot of cussing but nothing physical. Although J.C. never witnessed any physical violence, she was scared that Kimberly B. and Jason B. were going to "put hands on each other" when they argued.

¶ 23   After hearing counsels' arguments, the trial court first found that the State had failed to prove count I by a preponderance of the evidence. The court reasoned that there was insufficient evidence as to the origins of J.C.'s bruising, given testimony that J.C. was clumsy and had to be restrained on occasion. The court also noted that the DCFS status reports indicated that J.C. required occasional restraint in her current placement, which resulted in some additional bruising. Accordingly, the court dismissed count I.

¶ 24   Next, as to count II, the trial court found the evidence sufficient to find J.C. was neglected, based on an injurious environment, under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)), due to domestic violence occurring at J.C.'s home and her fear of returning to the home. The court reasoned that J.C. wanted to return home, so she recanted her previous statement to Horaz that she was fearful of returning home due to the domestic violence between Kimberly B. and Jason B. The court stated that there was ample evidence of domestic violence between Kimberly B. and Jason B., and the court expressed its belief that "it's

7

reasonable to suggest that a child who is loyal and faithful to her mother[,] as [J.C.] is[,] would, in fact, be fearful of that domestic violence and what it does to her mother or what it could do to her mother." After finding J.C. neglected, the court set the case for dispositional hearing and directed DCFS to prepare a disposition report.

¶ 25                                    B. Disposition Report

¶ 26    On February 18, 2021, Chandler filed a disposition report with updated information concerning J.C.'s parents. The report recommended that DCFS maintain custody and be awarded guardianship of J.C. It also recommended that the circuit court set J.C.'s permanency goal as independence.

¶ 27    The report detailed several previously indicated DCFS findings against Kimberly B. and Richard C. beginning in 2004, including findings for "Inadequate Supervision," "Inadequate Food," "Medical Neglect," and "Cuts Bruises Welts Abrasions and Oral injuries." The report also provided information concerning J.C.'s basic and medical needs. According to the report, J.C. was placed in an emergency shelter in Chicago, Illinois, where her basic needs were being met. She was attending counseling sessions and was compliant with her prescribed psychotropic medication. Despite this, J.C. threatened to run from her current placement, had exhibited aggressive, violent behaviors, and was defiant at times, and she also threatened to harm herself, staff, and peers.

¶ 28    According to the report, J.C. had been diagnosed with behavior disorders, spina bifida, neuromuscular dysfunction of the bladder (requiring catheterization), seizure disorder, and moderate intellectual disabilities. The report also documented that J.C. had a shunt placed in her head and was required to see several specialists at Cardinal Glennon Children's Hospital.

¶ 29                              C. Dispositional Hearing

¶ 30    On February 23, 2021, the trial court held a dispositional hearing. The court announced that it had reviewed the disposition report prepared by Chandler prior to the hearing. Chandler advised the court that the residential facility listed in the disposition report had subsequently declined to accept J.C. Chandler later made a referral to another facility but was still waiting on its decision. The State announced that it would stand on the dispositional report, which recommended a goal of independence. Kimberly B., the only witness to testify at the hearing, was then called to testify on her own behalf.

¶ 31    Kimberly B. first testified about her current circumstances. She was presently living by herself in an apartment in Harrisburg, Illinois, and Jason B. had filed for a divorce on February 9, 2021. She was ready, willing, and able to care for J.C. and would assist J.C. with achieving the recommended goal of independence by taking J.C. to outpatient life skill classes offered by local behavioral health facilities. Kimberly B. also testified that her other daughter lived nearby and was willing to assist her with J.C. Kimberly B. wanted J.C. to return home until a facility closer to home accepted her. She also talked to J.C. on a daily basis, and J.C. continued to express her desire to live with Kimberly B.

¶ 32    On cross-examination, Kimberly B. acknowledged that Jason B. was arrested for domestic battery after choking her on January 31, 2021, approximately five days after the adjudicatory hearing. Kimberly B. later testified on redirect that, although she had seen Jason B. since the incident, he had not been to her apartment, and she had no plans for him to be at her apartment or around J.C.

¶ 33    Following the close of evidence and counsels' arguments, the GAL recommended that J.C. remain in the care of DCFS. The GAL argued that J.C. was presently residing in a stable

9

environment and that her previous placements with Kimberly B. had failed. The GAL further argued that it was in J.C.'s best interests to remain in her current placement until DCFS located an alternative placement.

¶ 34 The trial court, expressing its agreement with the GAL, found that J.C. needed residential placement and that it was in her best interest to be made a ward of the court. The court determined Kimberly B. was unable for some reason other than financial circumstances alone to care for, protect, train, or discipline J.C. The court entered judgment granting custody and guardianship to DCFS with a permanency goal of independence. Kimberly B. now appeals.

¶ 35                                    II. Analysis

¶ 36 Kimberly B. initially argues that the trial court erred in finding that J.C. was neglected, as the State failed to prove that J.C. was in an environment injurious to her welfare by a preponderance of the evidence. Kimberly B. also argues that the court erred in making J.C. a ward of the court, finding her unable to care for J.C., and appointing DCFS as J.C.'s guardian. We address her contentions in turn.

¶ 37                              A. Adjudicatory Order

¶ 38 Kimberly B. initially argues that the State provided insufficient proof that J.C. was fearful of residing in her home due to domestic violence. Specifically, Kimberly B. argues that the State only proved an isolated incident of domestic violence and that J.C. testified that she wanted to return home, recanting her previous statement. For that reason, Kimberly B. argues that the trial court's finding of neglect based on an injurious environment was against the manifest weight of the evidence. We disagree.

¶ 39 The procedures for determining whether a minor should be removed from his or her parents' custody and made a ward of the court are set forth in the Act. *In re A.P.*, 2012 IL

10

113875, ¶ 18. The Act provides a two-step process to determine whether a minor should become a ward of the court. *Id*. The first step is the adjudicatory hearing, which is initiated by the filing of a petition through the state's attorney that alleges it is in the best interests of the minor and of the public that he be adjudged a ward of the court and may pray for relief available under the Act. *Id*. ¶ 19; see also 705 ILCS 405/2-13 (West 2020). Section 2-18(1) of the Act provides, in pertinent part, the following: "At the adjudicatory hearing, the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2020).

¶ 40    The trial court has broad discretion when determining the existence of abuse or neglect as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47. Thus, the trial court is in the best position to determine the credibility and weight to be given to the witnesses' testimony. *Id*. On review, we will not disturb the trial court's findings of abuse or neglect unless they are against the manifest weight of the evidence. *In re Tamesha T.*, 2014 IL App (1st) 132986, ¶ 31; see also *In re A.W.*, 231 Ill. 2d 241, 254 (2008) (the manifest weight of the evidence is the appropriate standard in reviewing the circuit court's determination of neglect based upon an injurious environment). A finding is against the manifest weight of the evidence only if the opposite result is clearly evident. *A.W.*, 231 Ill. 2d at 254.

¶ 41    Section 2-3(1)(b) of the Act defines a neglected minor to include "any minor under 18 years of age *** whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2020). "Neglect" has been defined as the failure to exercise the care that circumstances justly demand, including both willful and unintentional disregard of parental duty. *In re Kamesha J.*, 364 Ill. App. 3d 785, 792-93 (2006). The term "injurious environment" has been

11

characterized as an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe and nurturing shelter for her children. *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004).

¶ 42 Applying these principles and carefully reviewing the evidence in its entirety, we find the trial court's neglect finding is not against the manifest weight of the evidence. Here, the court determined that J.C. was neglected due to being in an environment injurious to her welfare pursuant to section 2-3(1)(b) of the Act. In support of its decision, the court relied on the evidence of domestic violence occurring at J.C.'s home, which the court concluded created an environment injurious to J.C.'s welfare by a preponderance of the evidence. We cannot say an opposite conclusion is clearly apparent.

¶ 43 Horaz testified, and J.C. confirmed, that J.C. had stated that Kimberly B. and Jason B. were fighting a lot and "it was getting physical and worse lately." The trial court found J.C.'s statement credible. Consistent with J.C.'s statement, Horaz was also able to verify one incident where J.C. called 911 after she witnessed Jason B. push Kimberly B. during an argument on October 12, 2020. The record also shows, and Kimberly B. does not dispute, that law enforcement had been repeatedly called to the home due to fighting between Kimberly B. and Jason B. Additionally, Kimberly B. informed Chandler that Jason B. was physically abusive to her throughout their relationship and that Jason B.'s screaming and yelling had caused some of J.C.'s behavioral problems. Moreover, the court also heard testimony concerning an additional incident of domestic violence that occurred after J.C. was placed in temporary custody with DCFS. Chandler testified, and Kimberly B. acknowledges, that Jason B. was arrested for domestic violence against Kimberly B. on October 20, 2020. In view of this, there is overwhelming evidence that would support a finding of a dysfunctional, sometimes violent,

12

relationship between Kimberly B. and Jason B., which, by Kimberly B.'s own admission, had a negative effect on J.C.

¶ 44 Additionally, in rendering its decision, the trial court considered J.C.'s initial statement that she was fearful of returning home. The court found this statement more believable than J.C.'s recanted statement made while she was in the care of DCFS. The court reasoned that J.C. wanted to return home, so she had recanted her earlier statement. The court stated that "it's reasonable to suggest that a child who is loyal and faithful to her mother[,] as [J.C.] is[,] would, in fact, be fearful of that domestic violence and what it does to her mother or what it could do to her mother." Given the evidence, we cannot find fault with the court's reasoning.

¶ 45 Based on the foregoing, there is sufficient evidence to support the trial court's finding that J.C. was neglected due to an environment injurious to her welfare. As such, the court's finding was not against the manifest weight of the evidence.

¶ 46                                B. Dispositional Order

¶ 47 Kimberly B. finally challenges the trial court's dispositional order. Kimberly B. argues that the trial court erred in adjudicating J.C. a ward of the court and in finding her unable to care for J.C., asserting that the record demonstrates that she is ready, willing, and able to care for J.C. We disagree.

¶ 48 After an adjudication of abuse, neglect, or dependency, the second step of the process is the dispositional hearing. *A.P.*, 2012 IL 113875, ¶ 21. "The health, safety and interests of the minor remain the guiding principles when issuing an order of disposition regarding the custody and guardianship of a minor ward." *Kamesha J.*, 364 Ill. App. 3d at 795. The Act provides that the trial court shall determine whether it is in the best interests of the minor and the public that the minor be made a ward of the court. 705 ILCS 405/2-22(1) (West 2020). If the minor is made

13

a ward of the court, the court must then determine "the proper disposition best serving the health, safety and interests of the minor and the public." *Id.* If the court determines that a parent, guardian, or legal custodian is "unfit or *** unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or [is] unwilling to do so," and the best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, the court may commit the minor to DCFS for care and services. *Id.* § 2-27(1)(d). In deciding on an appropriate disposition, a trial court must "consider whether, based on health, safety, and the best interests of the minor, *** appropriate services aimed at family preservation and family reunification have been unsuccessful in rectifying the conditions that have led to a finding of unfitness or inability to care for, protect, train, or discipline the minor." *Id.* § 2-27(1.5)(a) (West 2010). We will reverse the dispositional decision only if the trial court's findings of fact are against the manifest weight of the evidence or the court abused its discretion by selecting an inappropriate disposition. *In re J.C.*, 396 Ill. App. 3d 1050, 1060 (2009).

¶ 49    As noted, in the present case, the trial court found that it was in J.C.'s best interest to be made a ward of the court. Although Kimberly B. testified that she was ready, willing, and able to care for J.C. and would assist J.C. in achieving the recommended goal of independence, the court was not convinced. As such, the court found that Kimberly B. was "unable" to care for, protect, train, or discipline J.C. The court largely based its findings on J.C.'s individualized needs and Kimberly B.'s inability to provide a stable environment for J.C. We find ample evidence to support the court's findings.

¶ 50    Here, according to the disposition report, Kimberly B. has previous DCFS indicated findings of inadequate food and medical neglect. Although Kimberly B. and Jason B. were separated, and Jason B. had filed for divorce approximately two weeks prior to the dispositional

14

hearing, the divorce had not yet been finalized. Additionally, Kimberly B. acknowledged that Jason B. was arrested for domestic battery after choking her on January 31, 2021, approximately five days after the adjudicatory hearing. Even though Kimberly B. later testified that Jason had not been to her apartment, and she had no plans for him to be at her apartment or around J.C., she had seen Jason B. since the incident. Thus, Kimberly B. cannot reasonably argue that she had corrected the condition that brought J.C. into care.

¶ 51    Additionally, J.C. has serious medical conditions, which place her at greater risk of injury and require ongoing, specialized treatment at Cardinal Glennon Children's Hospital. J.C. also has cognitive delays and struggles with understanding consequences. In view of this, it is undeniable that J.C. requires a safe and stable environment. J.C.'s current placement provides for her basic needs and ensures that she receives the necessary medical treatment. Given the extent of J.C.'s behavioral issues, where she exhibits aggressive, threatening, and violent behaviors, her current placement provides a more stable environment for J.C., until a residential facility that can meet J.C.'s emotional, behavioral, social, and educational needs becomes available.

¶ 52    We note that J.C.'s disruptive behaviors were often beyond Kimberly B.'s ability to control, as evidenced by Kimberly B.'s past calls to law enforcement. We also note, as further evidence, that after J.C. was placed with Kimberly B. on November 5, 2020, Kimberly B. reported to DCFS that she could not handle J.C.'s disruptive behaviors, which resulted in J.C. returning to DCFS's temporary custody on November 24, 2020. Although J.C. continued to display such behaviors while in her current placement, she was compliant with her psychotropic medications and regularly attended counseling services. Again, we agree with the trial court's assessment that J.C.'s placement provides a better sense of stability while DCFS seeks a more appropriate placement for her in a residential treatment facility.

15

¶ 53    Accordingly, we find the trial court's findings that it was in J.C.'s best interest to be made a ward of the court and that Kimberly B. was unable, for some reason other than financial circumstances alone, to care for J.C. were not against the manifest weight of the evidence. Based on the unique circumstances present in this case, the court did not abuse its discretion in awarding DCFS guardianship of J.C. with a permanency goal of independence.

¶ 54                                     III. Conclusion

¶ 55    For the reasons stated, the adjudicatory and dispositional orders of the trial court are affirmed.

¶ 56    Affirmed.