# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Eskew v. Burlington Northern & Santa Fe Ry. Co.*, 2011 IL App (1st) 093450

---

| | |
|---|---|
| Appellate Court Caption | GARY ESKEW and JUDY HENDERSON, as Co-Administrators of the Estate of SCOTT ESKEW, Deceased, Plaintiffs-Appellees, v. THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, a Foreign Corporation, and THE NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, an Illinois Corporation d/b/a METRA, Defendants-Appellants. |
| District & No. | First District, First Division<br>Docket No. 1-09-3450 |
| Filed | September 30, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action for the fatal injuries suffered by a legally blind user of a commuter train service when he was struck by the train he usually used as it arrived at the station on a different track, the judgment for the administrators of decedent's estate assigning 95% of the liability to defendants and 5% to decedent was affirmed, and the trial court did not abuse its discretion in denying defendants' request for an evidentiary hearing on the issue of juror misconduct. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-L-0616; the Hon. Donald Suriano, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Raymond H. Groble III and Brian George, both of Daley Mohan Groble, P.C., of Chicago, for appellants.

Michael W. Rathsack, Jay Paul Deratany, and Patrick P. Degnan, all of Chicago, for appellees.

Panel

PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.

Justices Karnezis and Rochford concurred in the judgment and opinion.


**OPINION**

¶ 1        The plaintiffs, Gary Eskew and Judy Henderson, as co-administrators of the estate of Scott Eskew (Eskew), deceased, brought this action against the defendants, the Burlington Northern and Santa Fe Railway Company (BNSF) and the Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra (Metra), alleging that their negligence resulted in the death of Eskew. The jury returned a verdict for the plaintiffs in the amount of $5 million, assigning 85% of the liability to BNSF, 10% of the liability to Metra, and 5% contributory negligence to Eskew. Based on this verdict, the circuit court entered judgment for $4,750,000 in favor of the plaintiffs, and the defendants have appealed. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2        The evidence presented at trial established that Eskew, who was legally blind, habitually rode the 1:14 p.m. train from Berwyn to Chicago in order to begin his 3 p.m. shift as a security guard at the Art Institute of Chicago. Eskew was struck and killed by the eastbound commuter train as he attempted to cross from the platform on the north side of the tracks to the southern platform, where the 1:14 p.m. train usually arrived. The commuter train was operated by BNSF under a purchase of service agreement with the Northeast Illinois Regional Commuter Railroad Corporation, which does business as Metra.[1]

¶ 3        The Berwyn station is in a legislatively designated "quiet zone," which means that the train's horn should be sounded only in emergencies. There are three train tracks, the northern track, the center track, and the southern track, which are adjacent to each other and run east and west. The Berwyn station building is located on the south side of the tracks, between

---

[1]Although BNSF has attached to its reply brief a photocopy of a document purporting to indicate that BNSF also entered into a purchase of service agreement with the Commuter Rail Division of the RTA, we note that this document is not contained in the record on appeal and, therefore, may not be considered. See *Whittmanhart, Inc. v. CA, Inc.*, 402 Ill. App. 3d 848, 852, 932 N.E.2d 520 (2010) (recognizing that the record on appeal cannot be supplemented by attaching documents to the appendix of a brief).

Grove Avenue on the west and Oak Park Avenue on the east. Speakers for the public announcement system are located on each side of the station building. Announcements regarding track and schedule changes emanate from these speakers on the southern platform. A small shelter is located on the northern platform, directly north of the Metra station building. There are no speakers on the northern platform. Yellow "tactiles" border the pavement along the edge of the northern and southern platforms. Though passengers could hear the bells and see the signal lights when the gates went down, the gates would sometimes stay down and the bells would start to ring again. When commuters are on the north platform and the crossing gate is down, that gate is behind the waiting passengers. There is no gate inside the platform area.

¶ 4    The 1:14 p.m. eastbound train to Chicago arrived on the southern track of the Berwyn station on 90% of its runs, and passengers regularly boarded that train from the southern platform. Occasionally, the eastbound train ran on the northern tracks, requiring passengers to board from the northern platform. On the date of the accident, the 1:14 p.m. commuter train was rerouted to the northern track due to an unexpected westbound freight train that was traveling on the center track. The warning devices at the Grove Avenue crossing were working, and the gates on the north and south sides of the crossing were in the down position, and the bell signals had been activated for 31 seconds before the commuter train reached the Grove Avenue crossing. Also, the train's bell was ringing as it approached the crossing, but the horn had not been sounded.

¶ 5    Eskew's brother, Gary, who also is legally blind, testified that he was familiar with Eskew's daily route to the Berwyn train station. Gary stated that Eskew took small steps and walked slowly, as they had been taught. Gary also testified that he was familiar with the Berwyn station. Though the announcements could be heard, they could not always be understood. This was particularly true if you were standing on the north platform.

¶ 6    Eskew's wife, Heidi, testified that she had seen her husband wait at the crossing when a train was there. She stated that Eskew would turn his head to check whether a train was coming. He also listened for the horn or whistle to determine if there was a train. Heidi's mother, Judith Henderson, confirmed that Eskew walked very carefully. Eskew's neighbor, Anthony Castrogiovanni, testified that Eskew was very methodical and always took the same route to the train station. Castrogiovanni stated that Eskew stopped for the lights and bells at Grove Avenue.

¶ 7    Valerie Fitzgibbons, the BNSF station agent, had seen Eskew in the waiting area on previous occasions and was aware that he had taken the 1:14 p.m. train regularly during the prior two years. She knew that he was legally blind and had observed him holding a paper very close to read it and using a small device to see down the track. According to Fitzgibbons, Eskew walked hesitantly with a careful gait and did the same thing every day.

¶ 8    Fitzgibbons testified that, on the day of the accident, she was informed about the track change for the commuter train just minutes before it was due to arrive. She then made two identical announcements to advise waiting passengers that the eastbound train to Chicago would board from the north rather than the south platform, stating "please cross over to the north platform." She made the first announcement before the freight train arrived, and she

made the second announcement while the freight train was passing through the station. Fitzgibbons acknowledged that she did not inform the waiting passengers that two trains were coming into the station, and she was aware that the announcements could not always be heard when a train was going by.

¶ 9    Fitzgibbons stated that, after making the two announcements, she called the BNSF train conductor and advised her that passengers on the south side of the station needed to get to that train. Fitzgibbons testified that she asked the conductor to hold up or slow and wait for those passengers to cross. According to Fitzgibbons, she specifically asked the conductor to hold up before Grove Avenue, and the conductor acknowledged that request and agreed to wait. The commuter train arrived at the station between 5 to 15 seconds after the freight train had passed.

¶ 10    Beverly Thompson, the BNSF conductor on the incoming commuter train, testified that, on the day of the accident, she received a call from Fitzgibbons, who told her that there were passengers standing on the wrong side of the tracks. Thompson testified that she told Fitzgibbons that the train would wait for passengers to cross over to the north side of the tracks. She then asked the train engineer to stop short of Oak Park Avenue, but she did not tell the ticket agent that they were going to stop before Oak Park Avenue, rather than Grove Avenue.

¶ 11    Thompson further testified that she saw a man, whom she later learned was Eskew, standing just north of the yellow "tactile" strip on the northeast corner of the Grove Avenue crossing. He was looking east, and she did not know who he was. When the freight train cleared the station, the commuter train was almost at the edge of Grove Avenue, and the gates were down. As she was moving back to the vestibule, she heard the sound of the train striking Eskew. When she got off the train, she recognized Eskew as a man who had ridden the train before and was sight disabled. Thompson testified that Eskew was not in a position of safety when he was standing inside the pedestrian gate on the platform.

¶ 12    Engineer John Szychlinski testified that he was advised by Thompson that there were passengers waiting on the south side of the tracks. According to Szychlinski, the train was to stop short of the island circuit at the Oak Park Avenue crossing in order to allow the gates to "time out" and go up, thus permitting waiting passengers to cross the tracks safely at Oak Park Avenue. Szychlinski stated that he started to slow the train about 300 feet west of Grove Avenue as the freight train was clearing Grove. He saw a person, later determined to be Eskew, standing close to the Grove Avenue crossing. Eskew was facing east, with his back to the approaching commuter train, and then turned his head to the south but did not move. Szychlinski testified that Eskew went out of his view as the commuter train started to occupy the crossing. At the east end of the crossing, he heard a bang and put the train into emergency mode. In Szychlinski's opinion, Eskew was in a place of safety when he was standing on the walkway or the very edge of the platform.

¶ 13    Trainmaster Timothy Leppert testified that an engineer or conductor is required to sound the horn if they see a passenger who is not in a place of safety. That circumstance is considered to be an emergency, and the city's "quiet zone" rule prohibiting the use of the horn does not apply. In addition, the conductor can tell the engineer to stop.

¶ 14    Several passengers testified that it was difficult to hear and understand the announcements on the north platform. Katherine Zack testified that she was on the north platform on the day of the accident, and she saw Eskew standing on the sidewalk next to the tracks as the commuter train started to cross Grove Avenue. According to Zack, Eskew then stepped onto the first rail and was hit by the train.

¶ 15    The plaintiffs presented expert testimony from Kenrick Van Wyk, an acoustical engineer, who testified that, in his opinion, the passing freight train and the lack of speakers on the north side of the tracks interfered with the intelligibility of the announcements made over the public address system. Van Wyk also expressed his opinion that, because the intelligibility of the announcement had been reduced, it was more likely than not that the message was confused, causing Eskew to cross the tracks. During Van Wyk's testimony, the jury heard a recording of an announcement by a station agent at the Berwyn station, which was overlaid with a recording of a freight train to reflect the circumstances that existed on the northern platform prior to the accident. Van Wyk explained that the lack of speakers on the north platform rendered Fitzgibbons' announcement less intelligible in that location. According to Van Wyk, if the word "north," which contains soft consonants, was eliminated from that announcement, Eskew likely would have understood that he was supposed to cross over the tracks to the other platform. Van Wyk acknowledged, however, that he had no way of knowing what Eskew actually heard prior to the accident.

¶ 16    Daniel Melcher, the plaintiffs' expert in transportation safety engineering, testified that BNSF owns the Berwyn train station and platform, which are located on that railroad's right-of-way. BNSF operates its own freight trains and Metra commuter trains, and the train personnel are BNSF employees. The station's public address system was paid for by Metra at the time it was installed, but is operated jointly by BNSF and Metra. Therefore, announcements can be made by the station agent who is on-site, or they can be made remotely by the "Voice of Metra."

¶ 17    Melcher explained that, when the crossing gates are down, Grove Avenue is part of the Berwyn station platform because that is where the train stops and is one of the places where passengers board and alight from the train. The crossing gates are outside of the station and are designed to control through traffic. There are no pedestrian gates inside the station area.

¶ 18    Melcher opined that the Berwyn station is dangerous and a high-risk train-pedestrian location. In describing the functionality of the crossing devices, Melcher stated that the bells begin ringing when the signal has been activated, which is about 30 seconds before the train is due to arrive. The gates begin to move down about five seconds later. When the gates are in the down position, the bells stop because they are not required; the gates warn that a train is approaching. The bells remain silent as the train travels through the crossing and begin sounding again when it has cleared the crossing and the gates go back up.

¶ 19    According to Melcher, the ringing bells do not provide sufficient warning to passengers who are inside the platform area, particularly where two trains are traveling through the station. Melcher explained that, if a second train is approaching the station at about the same time that the first train has departed and cleared the station, a blind person would not know whether the ringing bells indicate that the first train has left and it is safe to cross the tracks

or that a second train is arriving. Melcher stated that these auditory signals could indicate that it is clear to cross the tracks because the train has left the station. In Melcher's opinion, these signals create a hazard because there is no difference in the tone of the warning bells and there is no physical cue, such as a gate, to inform a pedestrian of an approaching train.

¶ 20 Melcher also expressed his opinion that the lack of speakers on the north platform violated accepted standards of transportation safety care, and the public address system should have been sufficient to inform passengers on the north platform that they did not need to cross. In particular, Melcher stated that passengers on the north platform received a garbled message, which was not sufficient to advise Eskew of the track change.

¶ 21 Melcher further testified that the hazardous condition existing at the Berwyn station could be addressed by installation of a channeling device, comprised of a simple fence with signs, that would direct people on the platform who hear a "change track" announcement to walk eight feet out of their way to a spot behind the crossing gate. If the gate is in the down position, it provides a warning that a second train is coming. Melcher described this channeling device as "a cheap and simple option," which is used at all CTA stations with grade crossings. Melcher also described another solution, consisting of the installation of a second gate in the platform area to guide the movement of passengers who are already in the station, but he stated that this would be a more expensive option.

¶ 22 Melcher stated that he had no criticism of the pedestrian gates that were outside of the station area, and he indicated that they were very effective and were appropriately designed to control through traffic, as were the bell signals. However, he was of the opinion that the inadequacy of the public address system and the failure to have a channeling device or additional platform barrier contributed to cause the accident.

¶ 23 James Sotille, the plaintiffs' railroad safety expert, testified that, if the train conductor believed that Eskew was standing in a dangerous location, she was obligated to instruct the engineer to stop the train. In addition, Sotille expressed his opinion that the train crew should have sounded the horn if Eskew was not in a place of safety. In Sotille's opinion, the communication between Fitzgibbons and Thompson regarding stopping the train was inappropriate because it did not allow waiting passengers to cross the tracks safely.

¶ 24 The defendants presented the expert testimony of Clayton Weaver, a civil engineer, who testified that the Illinois Commerce Commission (ICC) does not govern the platform areas, which are controlled by BNSF. In addition, Weaver acknowledged that announcements over the public address system can be made by the station agent or by Metra. Weaver further testified that the speakers installed at the Berwyn station were placed on the south side of the tracks because that is where most of the inbound trains stop and is where people go to wait for trains. According to Weaver, the public address system conformed to engineering standards, and the warning devices at the Grove Avenue crossing were adequate and were consistent with applicable engineering requirements. Weaver stated that he believed the additional pedestrian gate recommended by Melcher would not comply with track clearance requirements, and the installation of such a gate would limit the maneuverable space to approximately 12 inches. Weaver expressed his opinion that the channeling device recommended by Melcher also would violate the clearance standards and would leave a 30-

inch gap at the edge of the platform.

¶ 25    Brian Heikkila, the defendants' railroad consultant, opined that the communication between Fitzgibbons and Thompson involved the routine exchange of pertinent information and was appropriate. Heikkila also testified that there was no need to sound the commuter train's horn because Eskew was observed to be standing in a position of safety on the northern platform at the east side of Grove Avenue. Heikkila noted that Thompson's last announcement was made while the freight train was passing through the station, and he agreed that it would be less than ideal if passengers on the north platform heard only snippets of the announcements.

¶ 26    Bernie Morris, who formerly worked as a chief railroad engineer for the ICC, testified that crossing gates are designed to protect automobiles and pedestrians. Morris agreed that the sidewalks along Grove Avenue are part of the platforms of the Berwyn station, and he stated that the safety devices at the crossing are adequate. In addition, Morris confirmed that the ICC does not govern station platforms.

¶ 27    The plaintiffs' complaint, as finally amended, alleged that BNSF was negligent in that it (1) failed to adequately communicate to commuters a change in the track being utilized by the approaching eastbound train, (2) failed to sound the train horn or whistle when circumstances required, (3) failed to stop the train before Grove Avenue, despite knowledge that passengers on the platform needed to cross the tracks, (4) failed to provide the additional care required of a common carrier having knowledge that its passenger was physically disabled, (5) failed to have in place an adequate public address system to warn pedestrians on the north side of the platform, (6) made improper announcements on the public address system, causing pedestrians on the platform to cross the tracks when the gates were down, (7) failed to have in place adequate communication policies and procedures to provide employees with clear instructions during schedule changes and when passengers were located on the wrong platform, and (8) failed to properly locate platform barriers to prevent pedestrians from crossing the tracks when a train was proceeding.

¶ 28    The plaintiffs' claims against Metra were confined to negligence in its use and operation of the public address system and were predicated on (1) the failure to adequately communicate to commuters a change in the track being utilized by the approaching eastbound train, and (2) the failure to adequately communicate schedule changes to commuters and the station ticket agent.

¶ 29    At the conclusion of the trial, the jury returned a verdict for the plaintiffs in the amount of $5 million, assigning 85% of the total liability to BNSF, 10% of the liability to Metra, and 5% contributory negligence to Eskew. The circuit court entered judgment for $4,750,000 in favor of the plaintiffs. The court subsequently denied the defendants' posttrial motion, as well as their motion requesting an evidentiary hearing to determine whether the jury's deliberations and verdict were compromised by juror misconduct. This appeal followed.

¶ 30    The issues raised by the defendants on appeal fall into four general categories: (1) improper jury instructions, (2) erroneous evidentiary rulings, (3) the improper denial of a directed verdict in favor of Metra, and (4) the erroneous denial of the motion for an evidentiary hearing on the issue of juror misconduct.

¶ 31    We initially address the defendants' claims that the trial court committed reversible error in instructing the jury. A litigant has the right to have the jury instructed on each theory that is supported by the evidence. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 100, 658 N.E.2d 450 (1995). Jury instructions are considered proper where they fairly, fully, and comprehensively informed the jury as to the relevant principles. *Leonardi*, 168 Ill. 2d at 100. Because the determination of whether to give a jury instruction is a matter within the discretion of the trial court, its decision will not be disturbed on review absent an abuse of that discretion. *Leonardi*, 168 Ill. 2d at 100. An abuse of discretion occurs only if "no reasonable person would take the view adopted by the trial court." *Dawdy v. Union Pacific R.R. Co.*, 207 Ill. 2d 167, 177, 797 N.E.2d 687 (2003).

¶ 32    The defendants first assert that the trial court erred by instructing the jury that a common carrier owes the highest duty of care to its passengers. According to the defendants, because Eskew was not boarding a train but was walking toward the place where he normally caught the 1:14 p.m. eastbound train, he was merely a pedestrian and could not be considered to be a passenger at the time of the accident. We cannot agree.

¶ 33    A common carrier must exercise the highest degree of care to its passengers. *Katamay v. Chicago Transit Authority*, 53 Ill. 2d 27, 29-30, 289 N.E.2d 623 (1972); *Skelton v. Chicago Transit Authority*, 214 Ill. App. 3d 554, 572, 573 N.E.2d 1315 (1991). A contractual relationship between passenger and carrier begins when the passenger has presented himself at the proper place to be transported with the intention of becoming a passenger and is then either expressly or impliedly accepted by the carrier for transportation. *Skelton*, 214 Ill. App. 3d at 572. The person must be at some place which is under the control of the carrier and provided for passengers, such as the waiting room or platform at the station, so that the carrier may exercise the high degree of care imposed upon it. *Skelton*, 214 Ill. App. 3d at 572. Whether the uncontroverted facts establish the relationship of carrier and passenger is a question of law for the court to determine. *Skelton*, 214 Ill. App. 3d at 573.

¶ 34    Here, it is undisputed that, immediately before Eskew attempted to cross the tracks, he was standing on the platform in a place where passengers routinely boarded and alighted from commuter trains. This area was within the sole control of the defendants, as evidenced by the fact that the crossing gates were lowered in the down position. In addition, the evidence reflects that Eskew would not have had to move in order to board the eastbound train and that the passengers who were waiting on the south platform had been advised to cross over the tracks in order to board the train from the north platform. Also, despite their assertion that Eskew's intent was "in dispute," the defendants have admitted both in the trial court and on appeal that Eskew intended to board the 1:14 p.m. eastbound train. Thus, the evidence established that Eskew was standing in a place that had been provided for passengers and was under the control of the defendants and that he intended to catch his regular train into the city. In light of these circumstances, we find no abuse of discretion in the trial court's decision to instruct the jury that a common carrier owed its passengers the highest duty of care. See *Katamay*, 53 Ill. 2d at 32; *Skelton*, 214 Ill. App. 3d at 573.

¶ 35    Next, the defendants argue that the court committed reversible error in refusing to instruct the jury that the duty of ordinary care was owed with regard to allegations relating to the condition and design of the Berwyn station. This argument is without merit.

¶ 36    First, we note that, although the defendants requested that the jury be instructed that the standard of ordinary care applied because Eskew was not a passenger, neither defendant tendered an ordinary care instruction based on the allegations relating to the physical aspects of the station or the public address system. As a result, this issue has been forfeited on appeal. See *Auton v. Logan Landfill, Inc.*, 105 Ill. 2d 537, 549, 475 N.E.2d 817 (1984).

¶ 37    Second, even if this issue had been preserved for appeal, such an instruction would not have been warranted. The defendants correctly assert that the duty of a carrier to provide reasonably safe depots, platforms, and approaches for the use of passengers requires the exercise of only ordinary care. *Davis v. South Side Elevated R.R. Co.*, 292 Ill. 378, 384, 127 N.E. 66 (1920); *Skelton*, 214 Ill. App. 3d at 573. However, the ordinary care standard controls the conduct of a common carrier when the claim for recovery is predicated on a theory of premises liability, and the issue is the safety of the premises themselves, such as where injury resulted from a defect or other dangerous condition in the station or platform. See *Skelton*, 214 Ill. App. 3d at 573-74.

¶ 38    In arguing that the allegations relating to the lack of an adequate public address system and sufficient platform barriers should be governed by the standard of ordinary care, the defendants entirely misconstrue the applicability of the premises liability rule set forth above. The plaintiffs did not allege that the failure to provide adequate speakers and channeling devices or barriers on the north platform created an inherently dangerous condition in the premises themselves. Rather, the failure to provide such devices was alleged to support the claim that the defendants failed to properly warn of and protect against the risk of injury to a passenger created by a moving train. The standard of ordinary care does not apply where, as here, a passenger is struck and killed by a train as it moves into a station and the claim for recovery is based upon allegations of negligence in the operation of the train. *Skelton*, 214 Ill. App. 3d at 573-74. Accordingly, even if an ordinary care instruction had been requested, the trial court would have been justified in refusing it.

¶ 39    The defendants also contend that the trial court committed reversible error by instructing the jury that the defendants owed Eskew an additional duty of care based on the fact that he suffered from a visual disability. In support, the defendants claim that such a duty is imposed only where the passenger has been accepted for carriage and the common carrier is aware that the passenger suffers from a disability that increase the dangers of travel. See *Chevalier v. Chicago Transit Authority*, 338 Ill. App. 119, 86 N.E.2d 838 (1949); *Burke v. Chicago & Northwestern R.R. Co.*, 108 Ill. App. 565 (1902).

¶ 40    The determination of what issues have been raised by the evidence is within the discretion of the trial court. *Leonardi*, 168 Ill. 2d at 100. The giving of an instruction is warranted as long as it is supported by some evidence in the record, even if the evidence is insubstantial. *Leonardi*, 168 Ill. 2d at 100-01. On appeal, a trial court will not be reversed "for giving faulty instructions unless they clearly misled the jury and resulted in prejudice to the appellant." *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 274, 775 N.E.2d 964 (2002).

¶ 41    In this case, the plaintiffs presented evidence that Fitzgibbons knew that Eskew was visually disabled and that he routinely caught the 1:14 p.m. train at the Berwyn station. In

addition, Thompson knew that Eskew was sight disabled and had ridden that train before. Before the accident, Thompson saw a man standing near the Grove Avenue crossing, but she said she did not recognize him to be Eskew because he was facing east. Based on this evidence, the trial court determined that the jury should be instructed regarding the additional duty owed by a common carrier to a passenger that is known to be physically disabled.

¶ 42     Even if we were to conclude that this evidence was not sufficient to justify an instruction on the additional duty owed to disabled passengers, we cannot discern how the defendants might have been prejudiced by the trial court's decision. Considering the nature of Eskew's visual disability, the additional duty of care, if applicable, required the defendants to ensure that auditory signals and physical barriers were adequate to protect a visually impaired passenger from the risk of being struck by a moving train. The precautionary measures that the defendants could have taken to satisfy this duty include: providing an adequate public address system to allow clear and intelligible warnings of schedule and track changes, sounding the train's horn as it approached the station, stopping the train in advance of the Grove Avenue station to allow waiting passengers to cross to the north platform safely, and providing platform barriers to prevent passengers from crossing the tracks when a train is moving into the station. While the failure to take such precautions would establish a breach of the heightened duty owed to passengers with disabilities, it also would support a verdict against the defendants based on the duty owed by a common carrier to its passengers in general. Consequently, any possible error in instructing the jury that the defendants owed Eskew an additional duty of care based on his visual disability would not have resulted in prejudice to the defendants, and the jury's verdict is not subject to reversal on this ground.

¶ 43     The defendants also claim that the trial court committed reversible error by instructing the jury regarding Eskew's careful habits and that this error was compounded by the court's refusal of an instruction advising that Eskew's attempt to cross the tracks while a warning bell was audible constituted a statutory violation. We review both claims of instructional error under the abuse of discretion standard. See *Leonardi*, 168 Ill. 2d at 100.

¶ 44     In reviewing the propriety of the careful habits instruction, we note that the question of whether Eskew had exercised ordinary care for his own safety was one of the pivotal issues in the case. At trial, the testimony of Eskew's family members and a neighbor established that he was very methodical and always took the same route when walking to the train and that he walked carefully and took slow, small steps. This testimony was admitted without objection or a request for a limiting instruction, and the trial court instructed the jury that it could consider that evidence when deciding whether Eskew had used ordinary care for his own safety.

¶ 45     In arguing that the careful habits instruction was improper, the defendants rely on *Frankenthal v. Grand Trunk Western R.R. Co.*, 120 Ill. App. 3d 409, 413, 458 N.E.2d 530 (1983), which addressed the admissibility of testimony regarding the careful habits of the decedent and held that such evidence is admissible to establish the decedent's due care prior to the accident only when there are no eyewitnesses to the accident. This rule is premised on the principle that, where there are competent eyewitnesses who observed the incident, habit evidence becomes unnecessary and should not be admitted. See *Plank v. Holman*, 46 Ill. 2d 465, 469-70, 264 N.E.2d 12 (1970); see also *Grewe v. West Washington County Unit District*

*No. 10*, 303 Ill. App. 3d 299, 306-07, 707 N.E.2d 739 (1999) (recognizing this "longstanding rule" in *dicta*).

¶ 46    The plaintiffs dispute the applicability of this rule of necessity and cite several cases stating that Illinois courts have adopted Federal Rule of Evidence 406 (Fed. R. Evid. 406), which permits the admission of habit evidence, regardless of the presence of eyewitnesses. See *Bradfield v. Illinois Central Gulf R.R. Co.*, 137 Ill. App. 3d 19, 23, 484 N.E.2d 365 (1985), *aff'd on other grounds*, 115 Ill. 2d 471, 505 N.E.2d 331 (1987); *Alvarado v. Goepp*, 278 Ill. App. 3d 494, 496-97, 663 N.E.2d 63 (1996); *Hajian v. Holy Family Hospital*, 273 Ill. App. 3d 932, 942-43, 652 N.E.2d 1132 (1995).

¶ 47    We need not determine the continued validity of the rule of necessity described above because the testimony regarding Eskew's careful habits was admitted without objection. In reaching this conclusion, we reject the defendants' assertion that the challenged instruction was improper because the testimony of Eskew's careful habits was elicited to explain "how a visually impaired person was able to function without the use of a seeing-eye dog or a walking stick." As previously noted, the defendants did not request a limiting instruction directing the jury to consider the habit testimony for that purpose only. See *Davis v. Kraff*, 405 Ill. App. 3d 20, 33, 937 N.E.2d 306 (2010). We find no abuse of discretion in the trial court's decision to issue the careful habits instruction.

¶ 48    The defendants also challenge the trial court's refusal to instruct the jury regarding Eskew's statutory duty, as follows:

> "[n]o pedestrian shall enter *** or traverse over a railroad grade crossing or pedestrian walkway crossing a railroad track when an audible bell *** is operational giving warning of the presence, approach, passage, or departure of a railroad train."

¶ 49    The trial court properly refused the proposed instruction because it was not warranted by the evidence and would have confused the jury. The instruction tendered by the defendants sets out the statutory duty of a pedestrian who is confronted by closed crossing gates and an audible warning bell at a grade crossing; it does not define the duty of a passenger who is standing on a station platform. There was no evidence that Eskew had attempted to traverse the crossing before he reached the platform. Rather, the evidence affirmatively established that Eskew was waiting on the platform and that he intended to catch his regular train, which was scheduled to arrive at 1:14 p.m. Thus, in deciding how to apportion the relative fault, the jury was charged with the task of evaluating Eskew's conduct as a passenger on the train platform rather than as a pedestrian. In light of these facts, we agree that giving the tendered instruction would have created confusion and could have been misleading to the jury. Therefore, we find no abuse of discretion in the trial court's refusal of this instruction. See *Malek v. Lederle Laboratories*, 125 Ill. App. 3d 870, 872, 466 N.E.2d 1038 (1984).

¶ 50    The defendants next argue that the trial court abused its discretion in making certain evidentiary rulings. The admission of evidence is a matter within the sound discretion of the trial court, and its decision will not be reversed on appeal unless that discretion has been clearly abused (*Leonardi*, 168 Ill. 2d at 92), such as where "no reasonable person would take the view adopted by the trial court" (*Dawdy*, 207 Ill. 2d at 177).

¶ 51    Evidence must be relevant to be admissible at a trial. *Voykin v. Estate of DeBoer*, 192 Ill.

-11-

2d 49, 57, 733 N.E.2d 1275 (2000); *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646, 924 N.E.2d 531 (2010). Evidence is relevant when it has a tendency to prove a fact in controversy or render a matter in issue more or less probable. *In re A.W.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733 (2008).

¶ 52 The defendants assert that, because the grade crossing devices near the Berwyn station had been approved by the ICC, the trial court erred in (1) excluding evidence that those devices were adequate as a matter of law and (2) permitting the plaintiffs to present evidence that additional platform barriers were necessary. In support of this assertion, the defendants rely primarily on *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 649 N.E.2d 1323 (1995), which held that the ICC's investigation of a crossing and approval of a particular safety device creates a conclusive legal presumption that the device is adequate and appropriate, precluding the plaintiffs from asserting that the railroad should have installed other warning devices. *Espinoza*, 165 Ill. 2d at 121.

¶ 53 The defendants' reliance on *Espinoza* is misplaced because the ICC regulates only those devices controlling people on the public way. The public's use of the street and sidewalk over the crossing is controlled by gates and bells, which are outside the station and protect pedestrians and the occupants of automobiles who are traversing the crossing while traveling to some other destination. Those gates do not control and are not intended to protect passengers who are standing on the platform awaiting an incoming train. Here, the plaintiffs did not allege that the warning devices at the Grove Avenue crossing were inadequate or were not functioning. Rather, the plaintiffs claimed that the safety and warning devices on the platform were inadequate. These claims were predicated on traditional negligence principles as opposed to the violation of ICC regulations. Thus, the fact that the crossing devices were compliant with ICC regulations was not relevant (see *In re A.W.*, 231 Ill. 2d at 256), and the plaintiffs were not barred from presenting evidence that additional safety precautions were necessary to protect passengers on the platform.

¶ 54 The defendants also argue that the trial court erroneously precluded them from introducing evidence that the design and construction of the Berwyn station complied with the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 *et seq.* (2000)). In support of this contention, the defendants claim that, because schedule and track information must be conveyed to those who are deaf, their compliance with the terms of the ADA necessarily was relevant to the issue of whether they had acted negligently in warning Eskew of the approaching commuter train. In particular, the defendants challenge the exclusion of evidence that the public address system complied with the ADA. However, the plaintiffs' complaint was based exclusively on common-law negligence principles, and the allegations relating to the inadequacy of the public address system were not based on ADA requirements. As a consequence, the question of whether the public address system installed at the Berwyn station complied with the ADA was entirely irrelevant to the issues being tried (see *In re A.W.*, 231 Ill. 2d at 256), and the trial court did not abuse its discretion in excluding such evidence.

¶ 55 The defendants further contend that the plaintiffs' allegations regarding the public address system and platform barriers were time-barred because they were not brought within the 10-year statute of repose applicable to claims for faulty construction. This contention is

premised on section 13-214(b) of the Code of Civil Procedure, which provides as follows:

> "No action based upon tort, contract or otherwise may be brought against any person for an act or omission of such person in the design, planning, supervision, observation or management of construction, or construction of an improvement to real property after 10 years have elapsed from the time of such act or omission." 735 ILCS 5/13-214(b) (West 2006).

¶ 56 This 10-year statute of repose "was enacted for the express purpose of insulating all participants in the construction process from the onerous task of defending against stale claims." *MBA Enterprises, Inc. v. Northern Illinois Gas Co.*, 307 Ill. App. 3d 285, 288, 717 N.E.2d 849 (1999). The plain language of the statute differentiates construction activities from other types of activities and protects against only those claims that are based on conduct falling within the enumerated construction-related activities. *Trtanj v. City of Granite City*, 379 Ill. App. 3d 795, 801-02, 884 N.E.2d 741 (2008); *MBA Enterprises, Inc.*, 307 Ill. App. 3d at 288. Though a statute of repose is to be interpreted liberally to fulfill its designated purpose, it must not be expanded to encompass circumstances that are beyond the legislature's intent. *Ryan v. Commonwealth Edison Co.*, 381 Ill. App. 3d 877, 883, 885 N.E.2d 544 (2008).

¶ 57 In this case, the plaintiffs' claims alleging the lack of an adequate public address system and sufficient platform barriers did not seek recovery for faulty construction or installation of an improvement to real property. Rather, those claims were predicated on the defendants' ongoing duty to maintain and operate the platform and the public address system in a safe manner that would protect against the risk of injury from a moving train. As such, they were not time-barred by the construction statute of repose set forth in section 13-214(b). See *Ryan*, 381 Ill. App. 3d 888-89; *Trtanj*, 379 Ill. App. 3d at 801-02; *MBA Enterprises, Inc.*, 307 Ill. App. 3d at 288-89.

¶ 58 We next address the assertion that the trial court committed reversible error by refusing to enter a directed verdict in favor of Metra because (1) the term "Metra" is only a trademark and is not a legally recognized entity, and (2) any claims against Metra were time-barred pursuant to the one-year statute of limitations governing claims against the Regional Transportation Authority (RTA). These assertions are without merit.

¶ 59 With regard to the first assertion, we note that counsel filed both an appearance and answer on behalf of "the Northeast Illinois Regional Commuter Railroad Corporation d/b/a Metra" in March 2006. No motion to strike the "d/b/a Metra" designation was ever filed, and the contention that Metra could not be sued because it is not a legally recognized entity was not raised until the defendants filed their motion for a directed verdict on August 18, 2009, at the conclusion of the eight-day trial. At that time, defense counsel acknowledged that the Northeast Illinois Regional Commuter Railroad Corporation has the trade name "Metra." We find that, as the plaintiffs argued in opposition to the defendants' motion, even if Metra should not have been included as a named defendant, the error could be remedied at any time under the statutory provision allowing for the correction of the name of a party sued under a misnomer (735 ILCS 5/2-401(b) (West 2008)). Consequently, it cannot be said that the trial court erred in denying the motion for a directed verdict on this ground.

¶ 60    As to the second assertion, the defendants rely on section 5.03 of the Regional Transportation Authority Act, which states that all claims against the RTA for wrongful death or injury to a person must be commenced within one year from the date the cause of action accrued. 70 ILCS 3615/5.03 (West 2008). The clear and unequivocal language in this provision establishes that the one-year statute of limitations applies only to claims against the RTA.

¶ 61    Here, the record demonstrates that the RTA, which was named as a defendant in the plaintiffs' original complaint, filed a motion to dismiss, in part, due to the fact that the action against it was not timely filed. In August 2006, the claims against the RTA were dismissed, and the trial court entered an order stating that "[t]his matter continues as to all other parties." The defendants do not contend that Metra, the name under which the Northeast Illinois Regional Commuter Railroad Corporation does business, is the same as the RTA and should have been similarly dismissed out in August 2006, nor do they cite any precedential authority or evidentiary support in the record explaining how the one-year statute of limitations governing claims against the RTA applies to the claims against Metra here. Accordingly, this contention has been forfeited on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Sept. 1, 2006).

¶ 62    Finally, the defendants argue that the trial court erred in denying their request for an evidentiary hearing on the issue of juror misconduct. In support of this argument, the defendants rely on statements contained in certain entries of an internet blog maintained by a juror, alleged to be Eve Bradshaw, who described her experiences during the trial.

¶ 63    The record reflects that the blog entry posted on August 16, 2009, contains the following statements:

> "But I can tell you some stuff. At one point on Friday, in the privacy of the jury room, one of the jurors said, 'Well, all that's left now is deciding how much.' I looked at her in disbelief. 'Lalalalalalala!' I singsonged, holding my fingers in my ears. 'You cannot talk that way, Juror L,' I said, 'You have to wait until ALL the evidence is in and we've heard from ALL the witnesses.'
>
> 'How come?' she said, *** 'It's clear to me who's at fault.'
>
> 'You don't know that,' chimed in my buddy, Juror F. 'What if they show us a suicide letter?'
>
> 'There's a suicide letter?'
>
> 'No, no, no!' we said in unison, and then JF continued, 'but you don't know what else they might tell us or show us. You have to wait to make up your mind!'
>
> * * *
>
> We spend our time in the jury room trying–but not succeeding–to NOT talk about the case . When deputy D pokes her head in, she looks around suspiciously. 'You're not talking about the case, are you?' she says.
>
> * * *
>
> One more thing: I tell Mr. Peevie [the juror's husband] things about the case, but I'm very careful not to give away any details that might let him know what the case

is. (Even if I did, he wouldn't pursue it. He has too much integrity and character to do so. He is packed with all sorts of annoying ethics.) But the other night, as we were talking, I almost–ALMOST–let the name of (large company) slip out. In fact, I did let the first syllable slip out. Twice. Oops."

Another entry posted on August 12, 2009, states as follows:

"Of course, it ain't over 'til it's over. After four full days of plaintiff-side witnesses, we've only heard one witness for the defense. The other jurors and I are guarding our objectivity fiercely until the last syllable of testimony has been uttered and the last molecule of evidence has been presented."

¶ 64    The defendants claim that the trial court erred in refusing to conduct *voir dire* to determine whether the integrity of the jury's process had been compromised. According to the defendants, the blog entries quoted above indicate that (1) jurors discussed the case amongst themselves before it was delivered to them for deliberation and decision, (2) one juror stated to other members of the jury that she had made up her mind on liability before the close of the evidence, and (3) the juror alleged to be Eve Bradshaw discussed the case with her husband during the trial. The defendants assert that the trial court erred in failing to investigate whether the verdict was contaminated because some of the jury members violated their oaths and were presented with improper "extraneous information." We disagree.

¶ 65    The determination of whether jurors have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial rests within the sound discretion of the trial court. *People v. Runge*, 234 Ill. 2d 68, 104-05, 917 N.E.2d 940 (2009). To compel a posttrial evidentiary hearing on juror misconduct, the moving party must produce " 'specific, detailed and nonconjectural evidence in support of [its] position.' " *People v. Kuntu*, 188 Ill. 2d 157, 161, 720 N.E.2d 1047 (1999) (quoting *People v. Towns*, 157 Ill. 2d 90, 102, 623 N.E.2d 269 (1993)). In general, a verdict cannot be impeached by testimony or affidavits relating to the motive, method, and process of jury deliberations. *Redmond v. Socha*, 216 Ill. 2d 622, 636, 837 N.E.2d 883 (2005); *Stallings v. Black & Decker (U.S.), Inc.*, 342 Ill. App. 3d 676, 680, 796 N.E.2d 143 (2003). However, a verdict may be challenged by testimony or affidavits establishing the existence of improper extraneous influences on the jury. *Redmond*, 216 Ill. 2d at 636; *Stallings*, 342 Ill. App. 3d at 680.

¶ 66    Even where a jury has been exposed to improper extraneous information, the verdict is not subject to automatic reversal. *People v. Willmer*, 396 Ill. App. 3d 175, 181, 919 N.E.2d 1035 (2009). "The party challenging the verdict must establish prejudice by showing that the information relates directly to something at issue in the case and that it may have influenced the verdict." *Willmer*, 396 Ill. App. 3d at 181. "Because it is impossible to prove whether extraneous information affected jurors' decisions, the courts do not require proof of actual prejudice when determining whether a jury verdict has been tainted." *Stallings* 342 Ill. App. 3d at 681. Rather, a presumption of prejudice exists "if the extraneous information bears on a crucial issue in the case and may have improperly influenced the verdict." *Stallings*, 342 Ill. App. 3d at 681; see also *People v. Holmes*, 69 Ill. 2d 507, 519, 372 N.E.2d 656 (1978). Once this presumption has been triggered, the burden then shifts to the prevailing party to show that no actual prejudice occurred. *Willmer*, 396 Ill. App. 3d at 181; *Stallings*, 342 Ill.

App. 3d at 681.

¶ 67    In this case, the trial court correctly observed that the defendants had not produced any showing that the jurors were exposed to improper extraneous information bearing on the crucial issues in the case. Nothing in the blog entries indicated that any information was received either from the husband of the juror who maintained the blog or from any other source. Although the record indicates that some comments were posted in response to certain of the blog entries referenced above, the defendants did not bring the substance of those comments to the attention of the trial court. Thus, the nature and content of such comments are not included in the record on appeal, and we cannot presume that the jury was prejudiced by exposure to extraneous information that bore on a crucial issue in the case and may have improperly influenced the verdict. See *Stallings*, 342 Ill. App. 3d at 681; *Holmes*, 69 Ill. 2d at 519. In addition, one juror's statement that "all that's left now is deciding how much," "[i]t's clear to me who's at fault" cannot be fairly characterized as extraneous information. Rather, the statement constituted a verbal articulation of the result of the juror's consideration of the evidence presented as of that point in the trial. Though it was expressed prematurely, this statement merely reflected that juror's mental process. We agree with the trial court's conclusion that the statements contained in the blog entries are not sufficient to show that the jury's verdict was tainted by external influences.

¶ 68    We also reject the defendants' contention that the blog entries demonstrate that certain members of the jury engaged in improper premature deliberations, which biased their later, actual deliberations. Questions of possible intra-jury influence or misconduct are treated differently from assertions of contamination by external influences. *Runge*, 234 Ill. 2d at 103. " '[A] trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations ***.' " *Runge*, 234 Ill. 2d at 105 (quoting *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000)). The supreme court has observed that, although premature jury deliberation is "not necessarily proper, [it] is not as serious as [the exertion of external influences on a jury], nor does every incident of juror misconduct require[ ] a new trial. [Citation.] What is crucial is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury." (Internal quotation marks omitted.) *Runge*, 234 Ill. 2d at 125. Improper jury deliberation mandates reversal only where the defendant has been so prejudiced as to have been denied a fair trial. *Runge*, 234 Ill. 2d at 128. "The important question in this regard is not whether the jurors kept silent with each other about the case, but whether each juror kept an open mind until the case was submitted to them." (Internal quotation marks omitted.) *Runge*, 234 Ill. 2d at 128.

¶ 69    Here, the defendants' argument that the verdict was the result of bias due to premature jury deliberations fails to acknowledge that the posted blog entries reflect that the jurors were committed to keeping an open mind and were "guarding their objectivity fiercely until the last syllable of testimony [had] been uttered and the last molecule of evidence [had] been presented." In addition, the blog reflects that, when one of the jurors expressed an opinion regarding liability, other jury members immediately responded and emphatically cautioned that they had to wait until all of the evidence had been presented before reaching any

conclusions. The blog entries on which the defendants rely do not indicate that premature deliberations resulted in a jury that was biased when it commenced its deliberations or that the jury's actual deliberations and verdict were affected by any discussions during trial. In fact, the entries indicate just the opposite. In light of these circumstances, we conclude that the trial court did not abuse its discretion in denying the defendants' request for an evidentiary hearing on the issue of juror misconduct.

¶ 70 For all of the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 71 Affirmed.